UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAPE M. DIEDHIOU,

                              Plaintiff,

            – against –

THE REPUBLIC OF SENEGAL *and*
PIERRE GOUDIABY, *individually and
D/B/A Atepa Engineering*,

                              Defendants.

**OPINION & ORDER**

20-cv-5685 (ER)

RAMOS, D.J.:

Pape Diedhiou brings this action against the Republic of Senegal ("Senegal") and Pierre Goudiaby, individually and doing business as Atepa Engineering (together, "Defendants"), to recover damages for years of architectural, commercial development, and other services that Diedhiou performed for Defendants, without ever being paid. Before the Court are Senegal's motion for summary judgment (Doc. 75) and Goudiaby's motion to dismiss (Doc. 96). For the reasons discussed below, Senegal's motion for summary judgment is DENIED, and Goudiaby's motion to dismiss is GRANTED in part and DENIED in part.

## I.   SENEGAL'S MOTION FOR SUMMARY JUDGMENT IS DENIED

### A. Background

#### 1. *Factual Background*[1]

Diedhiou holds a Bachelor of Science in architecture, but he is not a licensed architect in New York or anywhere else in the United States. Doc. 78-23 (Pl.'s Response to Senegal's R. 56.1 Statement of Undisputed Material Facts & Counterstatement of Material Facts) ¶¶ 1, 5. Because he does not have a license, he cannot stamp architectural drawings, but he can work on architectural drawings and projects under the supervision of a licensed architect. *Id.* ¶ 6. Diedhiou thus worked as a Senior Architect

---

[1] The following facts are undisputed except where otherwise noted.

at Urbahn Architects, PLLC ("Urbahn") in New York City from 2003 to 2010.  *Id.* ¶ 11; Doc. 78-2 (Diedhiou Dep. Tr.) at 10:21–25; Doc. 83 (Senegal's Responses to Pl.'s Counterstatement of Material Facts) ¶ 2.  During that same period, Diedhiou also owned his own company, Kumpo LLC ("Kumpo"), which he testified conducts business in real estate and construction, including architectural drawings and other construction development work.  Doc. 78-2 at 12:24–13:16, 21:17–22.

Goudiaby is Diedhiou's uncle.  *Id.* at 16:9–10.  He occasionally goes by the name "Atepa," and, in fact, his letterhead reads "Cabinet Pierre Goudiaby Atepa."  *See* Doc. 75-15 (Aug. 4, 2016 Letter from Goudiaby).

In approximately 2007, Goudiaby and Paul Badji (Senegal's then-ambassador and permanent representative in the United Nations) approached Diedhiou on behalf of Senegal to assist with locating and developing a commercial real estate project in New York City ("the Project").  Doc. 78-23 ¶ 4; Doc. 83 ¶ 3.  At the time, Abdoulaye Wade was president of Senegal.  Doc. 78-23 ¶ 28.

Diedhiou agreed to assist Senegal and, on November 10, 2007, Badji provided Diedhiou an official letter certifying Diedhiou's appointment "as [an] Agent acting on behalf of the Government of the Republic of Senegal" in connection with the Project. Doc. 83 ¶ 4; Doc. 78-8 (Nov. 10, 2007 Letter).  On June 26, 2008, Senegal (through Badji) created Teranga LLC ("Teranga"), a New York limited liability company of which Senegal was the sole member and Diedhiou the sole manager, to manage the Project. Doc. 78-23 ¶¶ 10[2], 50–51.  Teranga's operating agreement did not include a provision for any compensation to Diedhiou, but it did provide for reimbursements of expenses.  Doc. 75-7 at 8 (§ 6.1(c)).  Further, on June 30, 2008, Senegal (again through Badji) executed a durable power of attorney, appointing Diedhiou as Senegal's agent for "real estate

---

[2] Senegal asserts that Teranga was created to manage the project in 2007 (Doc. 78-23 ¶ 10), but it attaches Teranga's Operating Agreement, which is dated June 26, 2008 (Doc. 75-7).  It does not explain the discrepancy.

transactions relating to the acquisition and financing of the property known as 227–235 East 44th Street, New York, New York." Doc. 83 ¶ 5; Doc. 78-9 (Durable Power of Attorney).

On July 14, 2008, at Diedhiou's recommendation, Teranga retained Urbahn to provide architectural design services for the Project for $4.55 million. Doc. 78-23 ¶¶ 14, 34, 36; Doc. 83 ¶ 10; Doc. 78-20 (Teranga-Urbahn Contract). The contract listed Urbahn "w/ Atepa Engineering" as the Architect and Teranga as the "Owner"; pursuant to his role as Teranga's manager, Diedhiou signed on Teranga's behalf. Doc. 78-20 at 2, 18. The contract further provided that construction would commence on or about June 15, 2009 and be substantially complete on or about February 4, 2011.[3] *Id.* at 3; Doc. 78-23 ¶ 31. Before Urbahn was retained, Kumpo provided some architectural services on the Project.[4] Doc. 78-23 ¶¶ 12–13. The parties dispute whether, once Urbahn was retained, Diedhiou or Goudiaby directed and assisted with the design work: Diedhiou alleges he performed the interior design work and rendering for the project, while Senegal alleges that Goudiaby was the executive architect and performed the interior design and other architectural design work.[5] Doc. 78-23 ¶¶ 29, 33, 35, 38.

On November 18, 2009, Diedhiou, on Senegal's behalf, purchased the land at 227–235 East 44th Street, New York, New York ("the Property") for the Project. Doc. 83

---

[3] Urbahn ceased working on the Project on December 31 of either 2011 or 2012 and did not see the Project through to the occupancy of the building. Doc. 78-23 ¶¶ 30, 41, 47. Although Senegal consistently states that the date was December 31, 2011, it cites to deposition testimony providing, based on a document not submitted to the Court, that Urbahn's work was completed on December 31, 2012. Doc. 78-23 ¶ 41. Diedhiou disputes that Urbahn stopped in 2011 in one response, asserting that the appropriate year was 2012, but then agrees that the work was completed in 2011 in another response. *Id.* ¶¶ 41, 47.

[4] The parties do not specify the exact nature of Kumpo's work or how, if at all, it differed from the services Urbahn provided.

[5] Senegal is not consistent as to whether it disputes that Diedhiou, through Kumpo or otherwise, provided architectural design services for the Project. *Compare* Doc. 78-23 ¶ 7 ("[Diedhiou] did not do renderings and architectural designs for the projects."), *with* Doc. 83 ¶ 12 (disputing Diedhiou's statement that he "design[ed] the interiors of the building and provid[ed] other architectural services to the Property" *only* "insofar that [Diedhiou] was performing under Teranga LLC").

¶ 11; Doc. 78-21 (Bargain and Sale Deed) at 3.  Thereafter, Diedhiou performed
numerous professional and managerial services for the Project, including:

- Serving as Urbahn's primary point of contact;
- Paying taxes on the Property;
- Minimizing regulatory carrying costs for the Property;
- Managing and paying any violations incurred during development of the Property;
- Assisting with construction permitting and a geotechnical report for development of the Property; and
- Assisting with soliciting finance for development of the Property.

Doc. 83 ¶¶ 11–12.  In connection with this work, Diedhiou asserts he incurred substantial
costs and out-of-pocket expenses, which Senegal orally promised to reimburse along with
compensation for his services.  Doc. 78-23 ¶ 18; Doc. 83 ¶¶ 16, 19.  Senegal, however,
asserts that Diedhiou "has no documents whatsoever to prove that he incurred out of
pocket expenses."  Doc. 83 ¶ 16.  Senegal also claims that it always understood that
Goudiaby would pay Diedhiou, and that it had no direct payment obligations.  *Id.* ¶ 19.
Diedhiou responds that Goudiaby was not a signatory to, or otherwise mentioned in, any
of the legal instruments by which Senegal appointed Diedhiou its agent and manager, nor
that which granted him power of attorney; Diedhiou never was (or represented himself to
be) Goudiaby's agent; and Diedhiou never executed a subcontract agreement with
Goudiaby.  Doc. 83 ¶¶ 32–34.

　　　Sometime in 2010, Diedhiou resigned from Urbahn to avoid a conflict with his
work for Senegal, including as manager of Teranga.  Doc. 78-23 ¶ 11, 37.

　　　On March 26, 2010, Diedhiou sent an email to Richard Salomon, Christian Beltz,
and Roseline Jordan,[6] which said only:  "I had yet to hear from H.E. Samuel Sarr about
the fees payments or my compensation for my efforts in this deal.  At this moment we
should no longer respond to any request by Reed Smith as we are not being compensated

---

[6] The parties do not identify who these individuals are.

for it.  [T]hank you[.]" Doc. 75-8 (Mar. 26, 2010 Email).  While Senegal construes the email as a threat that Diedhiou would do no more work until he received compensation, Diedhiou says the email related only to unpaid real estate broker fees and contained neither a demand for payment from Senegal nor a threat to discontinue working. *Compare* Doc. 76 (Senegal's Mem. of L. in Support of Mot. for Summary Judgment) at 12, *with* Doc. 78 (Pl.'s Mem. of L. in Opp. to Summary Judgment) at 18–19.

On March 14, 2011, Diedhiou sent Senegal a $2,450,000 request for payment.[7] Doc. 78-23 ¶ 59.  Diedhiou asserts that the request was solely for Teranga's bills in connection with Urbahn's and others work on the Project and did not include any bills for his own services.  *Id.*  Senegal, however, asserts that Diedhiou sought payment for himself.  *Id.*

Sometime in 2011, Senegal temporarily halted the Project for financial reasons. Doc. 78-23 ¶ 31.  No development had begun on the Property at that time, as construction did not commence until 2014.  *See id.* ¶¶ 23, 41.

In April 2012, Macky Sall became president of Senegal.  Doc. 83 ¶ 18.  Diedhiou asserts that, after Sall became president, Diedhiou personally met with him and representatives of his government; Sall asked him to continue working as the manager for the Project and requested additional services of him; and Diedhiou continued to work on the Project through 2014.  Doc. 83 ¶¶ 18, 20–21, 23–25.  Senegal, however, asserts that once the Project was stopped in 2011, Senegal also transferred its management from Diedhiou and Teranga to another company.  Doc. 78-23 ¶¶ 31–32, 53.  Senegal is inconsistent as to whether Diedhiou ceased working for it on the Project in 2010, 2012, or 2013.  *See* Doc. 76 at 12–13 (listing all three dates).

On May 1, 2015, Diedhiou submitted an invoice to Fodé Seck, then-ambassador and permanent representative of Senegal at the United Nations, for $2,438,650 for his

---

[7] Senegal submitted a translated copy of the letter (originally in French) but did not attach any invoices (Doc. 75-9); Diedhiou submitted a copy of the letter only in French (Doc. 78-17).

services, costs, fees, and travel expenses.  Doc. 83 ¶ 27; Doc. 78-11 (May 1, 2015 Letter and Invoice).  On November 2, 2015, Diedhiou sent a "second notice" to Senegal regarding the outstanding payment of his invoice.  Doc. 83 ¶ 30, Doc. 78-12 (Nov. 2, 2015 Letter).

Nearly a year later, on August 10, 2016, Senegal refused to pay the invoice, as it had "paid all its commitments," and informed Diedhiou that he should redirect his claims to Goudiaby.  Doc. 83 ¶ 31; Doc. 78-13 (Aug. 10, 2016 Letter) at 4.  To date, Senegal has not paid Diedhiou and continues to maintain that it does not owe him anything because it fully paid Goudiaby, who promised to pay Diedhiou.  Doc. 83 ¶ 38; *see also* Doc. 75-15 (letter from Goudiaby to Seck, stating that Senegal had "paid all its contractual commitments" to Goudiaby, and Goudiaby would pay Diedhou his share).

2. *Procedural History*

Diedhiou brought contract and quasi-contract claims against Teranga and Senegal on July 23, 2020.  Doc. 1.  Senegal moved to dismiss on February 2, 2021.  Doc. 24.  On September 29, 2021, the Court dismissed Diedhiou's breach of contract claims for services rendered in connection with the purchase and transfer of the Property based on the statute of frauds, but it otherwise denied Senegal's motion.  Doc. 33.

Diedhiou amended his complaint on December 21, 2021 to add further details to his factual allegations, remove Teranga as a defendant, and name Goudiaby as a defendant.  Doc. 47.

Following discovery, Senegal filed the instant motion for summary judgment on February 16, 2023.  Doc. 75.

**B.  Legal Standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford*

*Union Free School Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might "affect the outcome of the litigation under the governing law."  *Id.* (quoting *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008)).  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Medical Ctr.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise.  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  The non-moving party must do more than show that there is "some metaphysical doubt as to the material facts."  *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (internal quotation marks omitted) (quoting *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor."  *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

### C.  Discussion

Senegal argues that:  the breach of contract claim is barred by the statute of limitations as well as the doctrine of laches; Teranga is the appropriate defendant, not

Senegal, under Teranga's operating agreement, but Diedhiou failed to pierce the corporate veil to reach Senegal; and the account stated claim should be dismissed because Diedhiou failed to prove that Goudiaby was an agent of Senegal. Doc. 76 at 12–17. The Court finds none of these arguments availing.

### 1. *Neither the Statute of Limitations nor Laches Bar Diedhiou's Contract Claim*

Because both Senegal's statute of limitations and laches arguments rest on the assertion that Diedhiou was improperly dilatory, the Court will address them together. Senegal contends that "[t]he cause of action for payment accrued on . . . March 26, 2010" when Diedhiou sent the email that it construes as a threat to cease working until he was paid. Doc. 76 at 12. In the alternative, Senegal proposes that the cause of action could have accrued when Diedhiou sent the request for payment on March 14, 2011 or when Diedhiou's services ended either in 2012 or 2013. *Id.* at 12–14. Accordingly, even by the latest date, Senegal argues the contract claim is barred by the six-year statute of limitations. *Id.* Relatedly, it contends that "Diedhiou knew since the year 2008 [that] he had not received any compensation from Senegal," but Diedhiou "did not even try to mitigate his damages by contacting his uncle [Goudiaby] and accepting any payment made by his uncle" and "waited 11 years prior to filing a lawsuit." *Id.* at 15. Accordingly, Senegal argues that laches bars Diedhiou's claim. *Id.*

Diedhiou agrees that a six-year statute of limitations governs his breach of contract claim. Doc. 78 at 14–15. But he argues the period did not begin to run until late 2014 or early 2015 when he completed his final work on the Project and thus became entitled to demand payment from Senegal for his years of work. Doc. 78 at 15–16. His suit was thus timely when filed on July 23, 2020. *Id.* In the alternative, he argues that Senegal's motion for summary judgment should be denied because there exists a genuine dispute of material fact as to the interpretation of Diedhiou's March 26, 2010 email and March 14, 2011 request for payment, upon which Senegal argues the cause of action is premised. *Id.* at 17–21. Diedhiou further asserts that he did not unreasonably delay in

8

pursuing payment because he promptly compiled and sent the May 1, 2015 invoice after he completed his services for the Project, and Senegal's argument that Diedhiou should have sought payment in 2008 at the very beginning of the Project is "wholly unreasonable." *Id.* at 23.

Summary judgment may be granted only where "the movant shows that there is no genuine dispute as to any material fact," such that the Court may enter judgment as a matter of law." Fed. R. Civ. P. 56(a). But, here, neither party has submitted evidence as to the payment terms of any contract between Senegal and Diedhiou, and ample disputes exist as to what services Diedhiou provided (*e.g.*, whether he or Goudiaby did the interior design work) and when he ceased providing services. In fact, Senegal provides conflicting information as to whether Diedhiou ceased working on the Project in 2010, 2012, or 2013. *See* Doc. 76 at 12–13 (listing all three dates). A breach of contract claim based on nonpayment accrues under New York law when the party owed money had the right to demand payment. *Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.*, 967 N.E.2d 1187, 1190–91 (N.Y. 2012). When Diedhiou worked and when payment was due is thus undoubtedly a material fact that will "affect the outcome of the litigation." *See Senno*, 812 F. Supp. 2d at 471 (citation omitted). Accordingly, the Court cannot grant summary judgment.

Similarly, where a dispute exists as to when Diedhiou ceased working for Senegal—and therefore whether he delayed bringing his claims—the Court cannot grant Senegal summary judgment on the basis of laches. "A party asserting this defense must prove (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense." *Guardian Music Corp. v. James W. Guercio Enters.*, 459 F. Supp. 2d 216, 223 (S.D.N.Y. 2006) (internal quotation marks omitted). Where Senegal is itself inconsistent as to how long Diedhiou waited to raise his claims, it cannot prove that he acted with a lack of diligence. *See id.* Moreover, "[l]aches is an equitable doctrine and cannot be invoked as a defense to a claim for damages." *Satan*

*Wears Suspenders, Inc. v. Jaar*, No. 21-cv-812 (ER), 2022 U.S. Dist. LEXIS 107889, at *13 (S.D.N.Y. June 16, 2022) (quoting *Ogilvy Group Sweden v. Tiger Telematics, Inc.*, No. 05-cv-8488 (DLC), 2006 WL 547785, at *2 (S.D.N.Y. Mar. 7, 2006)); *see also Deutsche Bank Tr. Co. Ams. v. Rado Ltd. P'ship*, No. 18-cv-6768 (DLC), 2019 WL 4038761, at *7 (S.D.N.Y. Aug. 27, 2019) ("[T]he doctrine of laches does not provide a defense to a claim of damages for breach of contract."), *aff'd*, 819 F. App'x 66 (2d Cir. 2020).  Senegal makes no effort to show how laches could be available in the instant case, which solely seeks damages without any claim for equitable relief.  *See* Doc. 76 at 15.  Accordingly, the Court denies Senegal's motion for summary judgment on Diedhiou's breach of contract claim.

> ### 2. *Senegal Has Not Proven that Diedhiou Must Pierce the Corporate Veil to Recover*

Senegal contends that Diedhiou provided services only to Teranga, not Senegal, and Diedhiou's claim for breach of contract is therefore properly *only* against Teranga unless he pierces the corporate veil.  Doc. 76 at 16.  Diedhiou responds that he worked *under* Teranga but *for* Senegal, with whom he had the contractual relationship, and Senegal is therefore liable for nonpayment.[8]  Doc. 78 at 24–25.

Senegal's arguments are unavailing.  First, it cites no evidence to support its argument that Diedhiou provided services only to Teranga and not Senegal, nor does it even allege the absence of evidence in support of Diedhiou's claim.  Doc. 76 at 16.  Rather, it simply ignores its evidentiary burden altogether.  This alone is reason to deny Senegal's motion.  *See Polanco v. 34th St. P'ship*, 724 F. Supp. 2d 420, 424 (S.D.N.Y. 2010) ("The moving party bears the burden of proving that no genuine issue of material fact exists, or that due to the paucity of evidence presented by the non-movant, no

---

[8] Diedhiou also argues that Senegal's argument is "pointless because a manager of an LLC need not pierce the corporate veil to sue the LLC's members for breach of an operating agreement."  Doc. 78 at 25. Diedhiou fails to cite any law in support of his argument, however, and the Court therefore will not consider it.

rational jury could find in favor of the non-moving party." (citing *Gallo v. Prudential Residential Servs., L.P.*, 22 F.3d 1219, 1223 (2d Cir. 1994))).  Moreover, it fails to respond to Diedhiou's allegations that he had an oral contract with Senegal under which he provided services, including his agreement to serve as Teranga's manager (Doc. 78 at 25), and thereby misconstrues the crux of his breach of contract claim.  *See* Doc. 76 at 16; Doc. 84 (Senegal Reply Mem.) at 10–11.  Accordingly, Senegal's motion is denied.

     *3.  Account Stated*

Finally, Senegal argues that the account stated claim must be dismissed because "[t]he Court stated in its decision that should Plaintiff fail to prove that Goudiaby was an agent of Senegal, the account stated claim would be dismissed."  Doc. 76 at 16.  In support of its argument that Diedhiou failed to establish Goudiaby was its agent, Senegal references the existence of the depositions of Diedhiou and an Urbahn architect, as well as an affidavit from Goudiaby, without any further explanation or citation.  *Id*.  Diedhiou responds that Senegal misrepresents the Court's prior opinion and, in any event, evidence does exist that Goudiaby acted as Senegal's agent.  Doc. 78 at 25–26 (citing Doc. 78-6 (Cheikh Niang, Ambassador and Permanent Representative of Senegal to the United Nations, Dep. Tr.) at 61:3–16, 94:2–23).

In its prior opinion, the Court declined to dismiss Diedhiou's account stated claim because, while such a claim is usually subject to dismissal when a defendant disputes responsibility for payment, Senegal was not able to show that it had disputed payment by directing Diedhiou to Goudiaby for payment so long as Diedhiou alleged Goudiaby was also Senegal's agent.  Doc. 33 at 17.  Specifically, the Court held:

> Because Senegal has presented no argument disputing that allega-
> tion [that Goudiaby was its agent] at this time, the Court declines to
> dismiss the claim for account stated, as re-directing Diedhiou to an
> individual who is also an agent of Senegal would not constitute a
> dispute about Senegal's responsibility for paying the account.  How-
> ever, *in the event the Goudiaby is **found** not to be an agent of Sene-
> gal, the claim for account stated would fail*, because then Senegal
> would have disclaimed its legal responsibility for the invoice

> amount approximately three months after its receipt, and Diedhiou
> cites to no case holding that its doing so within that period of time
> is untimely as a matter of law.

*Id.* (emphases added).  In other words, the Court held that the account stated claim would fail if the Court made a factual finding that Goudiaby was not an agent of Senegal.

A "[c]ourt cannot make findings of fact on a motion for summary judgment." *Ramos v. Marriott Int'l*, 134 F. Supp. 2d 328, 341 (S.D.N.Y. 2001).  Moreover—even if Senegal satisfied its burden by its mere passing reference to depositions (which it did not, *see Polanco*, 724 F. Supp. 2d at 424)—Diedhiou has proffered evidence that Senegal understood Goudiaby to be acting as its agent with respect to the Project (*see* Doc. 78-6 at 61:3–16, 94:2–23), which satisfies *his* burden to resist summary judgment, *see Senno*, 812 F. Supp. 2d at 467–68.

Therefore, Senegal's motion for summary judgment is denied.

## II.  GOUDIABY'S MOTION TO DISMISS IS GRANTED IN PART AND DENIED IN PART

After Senegal moved for summary judgment, Diedhiou further amended his complaint on May 29, 2023.  Doc. 95 (Second Amended Compl.).  Goudiaby moved to dismiss on June 9, 2023.  Doc. 96.

### A.  Background

As relevant here, in his second amended complaint, Diedhiou brings claims against Goudiaby, "individually and d/b/a Atepa Engineering," for breach of contract, quantum meruit, unjust enrichment, promissory estoppel, and piercing the corporate veil. Doc. 95.  Diedhiou alleges Atepa Engineering is a "Panamanian legal entity that is owned or wholly controlled by Goudiaby," and he further alleges it is one of Goudiaby's many shell companies and that it was featured in the Panama Papers.[9]  *Id.* ¶¶ 12, 64.  Goudiaby also often publicly refers to himself as "Atepa," which translates to "builder."  *Id.* ¶ 18.

---

[9] The Panama Papers refers to a leak of more than 11.5 million financial and legal records from a Panamanian law firm, Mossack Fonseca, meant to expose a system of corruption and other crimes that had been hidden through offshore companies.  *Panama Papers*, INT'L CONSORTIUM OF INVESTIGATIVE JOURNALISTS, https://www.icij.org/investigations/panama-papers/ (last accessed Sept. 1, 2023).

The factual allegations in the second amended complaint largely mirror the facts in Diedhiou and Senegal's Rule 56.1 statements except that in the complaint Diedhiou repeatedly refers to actions having been done by or for "Senegal and/or Goudiaby."  For instance, he alleges he "performed a number of valuable services worth millions of dollars to Senegal and/or Goudiaby for years.  Senegal and/or Goudiaby knowingly accepted the benefits of the services, sought more services from [Diedhiou], and repeatedly promised to pay, but have ultimately failed to ever compensate [Diedhiou] for his hard work and dedication."  *Id.* ¶ 2.  He also alleges that he "incurred substantial out-of-pocket expenses on behalf of Senegal and/or Goudiaby."  *Id.* ¶ 40.

Specifically, Badji and Diedhiou's uncle Goudiaby, a prominent architect in Senegal and a Special Advisor to President Wade (and thereby an agent of Senegal), approached Diedhiou in 2007 to assist with the Project.  *Id.* ¶¶ 16–22.  Diedhiou agreed and first worked with Badji, Goudiaby, and members of the Senegalese government to find and purchase the Property through Teranga, which was created solely to assist with the Project.  *Id.* ¶¶ 24–31.  "Thereafter, from between roughly 2008 through late 2014, Diedhiou continued to serve as a steward to the Property at Senegal and/or Goudiaby's repeated and explicit requests."  *Id.* ¶ 32.

Throughout the period of Diedhiou's work, Goudiaby and Senegalese officials assured Diedhiou "that he would be well-compensated for his dedication and services to the Property and to Senegal, and also reimbursed for his out-of-pocket expenses."  *Id.* ¶ 39.  At a December 2014 meeting towards the end of Diedhiou's work, Pape Sene, Special Advisor to President Sall, assured Diedhiou he would be paid for his services.  *Id.* ¶ 48.  Thereafter, "various Senegalese officials" told Diedhiou to submit a formal invoice, which he submitted in May 2016[10] to Seck.  *Id.* ¶¶ 49–50.  Approximately four months

---

[10] Although Senegal's motion for summary judgment attaches Diedhiou's letter and invoice (Doc. 75-11)—and dates it May 1, 2015—Diedhiou's second amended complaint does not.  As the complaint states that the invoice was sent in May *2016* and the Court must take Diedhiou's factual allegations as true in deciding

later, in August 2016, Seck directed Diedhiou to seek payment directly from Goudiaby. *Id.* ¶ 52.

Diedhiou does not state whether he did thereafter approach his uncle for payment, but he alleges that, in any event, neither Goudiaby, Senegal, nor anyone else has ever paid him anything for his work on the Project. *Id.* ¶ 57. On the other hand, Goudiaby was paid at least $2,750,000 for the Project, and one of his wholly owned companies, Atepa China Africa Links Ltd., was paid an additional $460,000. *Id.* ¶ 63.

After years of development on the Property, Diedhiou alleges that eventually "Senegal successfully erected a commercial building on the Property worth many millions of dollars for its own exclusive benefit." *Id.* ¶ 56.

### B. Legal Standard

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). However, this "flexible plausibility standard" is not a heightened pleading standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (internal quotation marks and citation omitted), and "a complaint . . . does not need detailed factual allegations" to survive a motion to dismiss, *Twombly*, 550 U.S. at 555.

---

a motion to dismiss, the Court will use the May 2016 date for purposes of deciding the motion to dismiss. *See Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 768 (2d Cir. 2010) ("When considering a motion to dismiss under Federal Rule 12(b)(6), a court must accept all factual allegations in the complaint as true, even if the allegations are doubtful in fact." (citation omitted)).

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). Indeed, "the purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citation omitted). Thus, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014).

In considering a Rule 12(b)(6) motion, a district court may consider only the complaint, exhibits thereto, and any document incorporated by reference or integral to it. *ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen LLP*, 736 F.3d 213, 219 (2d Cir. 2013)). When a party presents extrinsic evidence in response to a 12(b)(6) motion, "a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000) (citation and internal quotation marks omitted). Conversion to a summary judgment motion is generally not appropriate unless the parties have had "the opportunity to conduct appropriate discovery and submit additional supporting materials." *See Korova Milk Bar of White Plains, Inc. v. PRE Props., LLC*, No. 11-cv-3327 (ER), 2013 WL 417406, at *6 (S.D.N.Y. Feb. 4, 2013).

**C. Discussion**

*1. Diedhiou Has Sufficiently Pled that Goudiaby is Liable for His Own Actions, But Not Atepa Engineering's*

Goudiaby first argues that, as Atepa Engineering is a distinct legal entity, Diedhiou has not properly brought claims against it merely by asserting that he brings claims against Goudiaby "individually and d/b/a Atepa Engineering"; and, moreover, Goudiaby is not individually liable for any of Diedhiou's claims because only Atepa Engineering had payment obligations to Diedhiou. Doc. 98 (Goudiaby's Mem. of L. in Support of Mot. to Dismiss) at 12–18. Goudiaby further seeks to dismiss Diedhiou's claim for veil piercing on the basis that Diedhiou failed to sufficiently plead specific facts or circumstances to give rise to the claim. *Id.* Diedhiou responds that the complaint sufficiently alleges that Goudiaby was personally liable and references several items produced in discovery in support. Doc. 100 (Pl.'s Mem. of L. in Opp. to Dismissal) at 7–7–10. He further argues that dismissal of the veil piercing claim is premature because the complaint only seeks to pierce the corporate veil "[t]o the extent that Goudiaby attempts to use the corporate shield of any legal entity which he allegedly owns or with which he is affiliated in order to attempt to avoid personal liability herein," but Goudiaby has not yet done so. *Id.* at 9.

As a preliminary matter, the Court notes that, in deciding the instant motion to dismiss, it will look only to the complaint and exhibits thereto, not the deposition and interrogatory evidence Diedhiou asks the Court to consider. *See Friedl*, 210 F.3d at 83. Although Goudiaby may have participated in some limited discovery in the case, he has not submitted any discovery or supporting materials in support of his motion, and the Court accordingly declines to convert the motion to dismiss into a motion for summary judgment. *See Korova*, 2013 WL 417406, at *6.

As to Goudiaby's argument that Diedhiou may not bring claims against Atepa Engineering merely by suing him "d/b/a Atepa Engineering," the Court agrees; but this does not preclude Diedhiou from bringing claims against Goudiaby for actions Goudiaby

16

personally took while holding himself out as Atepa Engineering.  "The words 'doing business as' or the abbreviation d/b/a indicate that the name following is an assumed name."  *Sunskar Ltd. v. CDII Trading, Inc.*, 828 F. Supp. 2d 604, 619 (S.D.N.Y. 2011) (citation omitted); *see also Hutson v. Notorious B.I.G., LLC*, No. 14-cv-2307 (RJS), 2015 U.S. Dist. LEXIS 170733, at *15 (S.D.N.Y. Dec. 21, 2015) ("SGP, however, is not an independent Plaintiff in this action, and merely listing in the caption . . . that Plaintiff does business as SGP fails to establish that Plaintiff and SGP should be treated as the same entity . . . ."); *Care Envtl. Corp. v. M2 Techs., Inc.*, No. 05-cv-1600 (CPS), 2006 U.S. Dist. LEXIS 2934, at *18 (E.D.N.Y. Jan. 18, 2006) ("[T]he designation 'd/b/a' . . . is merely descriptive of the person or corporation who does business under some other name.  Doing business under another name does not create an entity [separate] from the person operating the business.  The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations." (citation omitted)).  The entity listed before the "d/b/a" remains the true party in the action.  *Hutson*, 2015 U.S. Dist. LEXIS 170733, at *16.  Thus, where one party assumes another name to do business, the acting party will remain liable for its actions notwithstanding the name by which it held itself out.  *See Care Envtl. Corp.*, 2006 U.S. Dist. LEXIS 2934, at *18.  And this may remain the case even where the assumed name is that of a separate and distinct legal entity wholly owned by it.  *See Sunskar Ltd.*, 828 F. Supp. 2d at 619–20.

Accordingly, the true party in the action here remains Goudiaby, not Atepa Engineering.  *See Hutson*, 2015 U.S. Dist. LEXIS 170733, at *16.  As a named defendant, Diedhiou may therefore bring claims asserting that Goudiaby is liable for his own actions.  This is true even where Goudiaby was the true actor but he signed or otherwise assumed the name Atepa Engineering.  *See Sunskar Ltd.*, 828 F. Supp. 2d at 619–20.  On the other hand, since Atepa Engineering is not a named defendant, Diedhiou may not bring claims asserting that Goudiaby is liable for *Atepa Engineering*'s actions.

*See Care Envtl. Corp.*, 2006 U.S. Dist. LEXIS 2934, at *18.  In other words, while

Diedhiou may hold Goudiaby liable only for his own actions, to the extent Diedhiou's

claims against Goudiaby seek to do otherwise, they are improper and dismissed.

The d/b/a theory is distinct from, and does not necessarily require, veil piercing—

which merely allows a third party to reach through the corporate form (which would

ordinarily limit owners' liability) and personally "hold [the owners] liable for some

underlying *corporate* obligation."  *See Graham Hanson Design LLC v. 511 9th LLC*, No.

10-cv-5493 (KMW), 2011 U.S. Dist. LEXIS 18623, at *11 (S.D.N.Y. Feb. 23, 2011)

(emphasis added) (citation omitted).  A veil piercing theory thus holds individuals liable

for the *company's* actions, whereas the "d/b/a" theory would hold individuals liable for

*their own* actions (even if they purported to be the company when they acted).

To allege a claim for piercing the corporate veil under the alter ego theory, as

Diedhiou seeks to do here, a plaintiff must plead facts sufficient to show that the

defendant owner dominated and controlled the corporate entity *and* that it resulted it a

fraud or wrong.  *Apex Mar. Co. v. OHM Enters.*, No. 10-cv-8119 (SAS), 2011 U.S. Dist.

LEXIS 35707, at *15 (S.D.N.Y. Mar. 30, 2011).  A plaintiff who merely states "that the

corporation was dominated by the defendants . . . without more, will not suffice to

support the equitable relief of piercing the corporate veil. . . . The unadorned invocation

of dominion and control is simply not enough."  *Id.* (citations and internal quotation

marks omitted).  Here, Diedhiou seeks to pierce the corporate veil of "Atepa

Engineering," "Atepa Group," "Cabinet Pierre Atepa Goudiaby," "Cabinet Pierre

Goudiaby Atepa," and "Atepa China Africa Links Ltd." as alter egos of Goudiaby.  Doc.

95 ¶¶ 87, 94.  In support, he states that Goudiaby:

- "possesses complete dominion or control over all of the above supposed corporate forms";
- "uses any or all of the above supposed corporate forms to conduct business in his personal capacity, and did so here vis-à-vis this project";

- ▪ "uses any or all of the above supposed corporate forms to shuttle personal funds around";
- ▪ "does not maintain proper corporate formalities as to any of the above supposed corporate forms"; and
- ▪ used his "dominion or control over the supposed corporate forms . . . for the purpose of avoiding the obligation Goudiaby owed to [Diedhiou]," which "has resulted in unjust denial of [Diedhiou's] compensation."

*Id.* ¶¶ 88–93.  But, these are precisely the sort of "unadorned invocation[s] of dominion and control" that "will not suffice to support the equitable relief of piercing the corporate veil."  *See Apex Mar. Co.*, 2011 U.S. Dist. LEXIS 35707, at *15.  Accordingly, Diedhiou's claim to pierce the corporate veil is dismissed.

Because Diedhiou may not therefore hold Goudiaby liable for Atepa Engineering's actions either through a "d/b/a" theory or by veil piercing, his claims are dismissed insofar as they concern liability for Atepa Engineering.

### 2.  *Diedhiou Has Not Sufficiently Pled a Claim for Breach of Contract Against Goudiaby*

Goudiaby further moves to dismiss Diedhiou's claim for breach of contract on the basis that Diedhiou failed to sufficiently plead the existence of a contract because he failed to allege any of the terms or essential elements of a contract between Diedhiou and Goudiaby.  Doc. 98 at 18–19.  Diedhiou did not address Goudiaby's arguments in his opposition.  *See* Doc. 100.

First, the Court notes that a "party's failure to address [a] claim raised in [an] adversary's papers may indicate abandonment."  *Hanig v. Yorktown Cent. School Dist.*, 384 F. Supp. 2d 710, 723 (S.D.N.Y. 2005) (citing *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 828 F. Supp. 1114, 1129 (S.D.N.Y. 1993).  Accordingly, where a plaintiff fails to respond to defendants' arguments in support of their motion to dismiss, courts will deem the underlying claim or argument dismissed.  *See, e.g., Bright-Asante v. Saks & Co.*, 242 F. Supp. 3d 229, 238 (S.D.N.Y. 2017); *Arma v. Buyseasons, Inc.*, 591 F. Supp. 2d 637, 642–43 (S.D.N.Y. 2008).  This alone is reason to dismiss Diedhiou's contract claim.

Moreover, the Court agrees that Diedhiou has failed to establish the existence of a contract.  To state a claim for breach of contract, a plaintiff must plead that an agreement exists, he adequately performed it, defendants breached it, and he suffered damages therefrom.  *Ebomwonyi v. Sea Shipping Line*, 473 F. Supp. 3d 338, 347 (S.D.N.Y. 2020) (citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  "A complaint fails to plead the first element—the existence of a contract—'if it does not provide factual allegations regarding . . . the formation of the contract, the date it took place, and the contract's major terms.  Conclusory allegations that a contract existed or that it was breached do not suffice.'"  *Sharbat v. Iovance Biotherapeutics, Inc.*, No. 20-cv-1391 (ER), 2022 U.S. Dist. LEXIS 2328, at *12 (S.D.N.Y. Jan. 5, 2022) (alteration in original) (citations omitted).  Diedhiou's only attempt to establish a contract between him and Goudiaby is his inclusion of "and/or Goudiaby" after several allegations.  For instance, he alleges that he agreed to assist with the Property for "Senegal and/or Goudiaby," and he incurred expenses "on behalf of Senegal and/or Goudiaby" that "Senegalese officials and Goudiaby" assured Diedhiou would be reimbursed.  *See, e.g.* Doc. 95 ¶¶ 2, 39–40.  The complaint is devoid of specific dates or details for offer, acceptance, and performance of the contract; and the terms or amount of payment to Diedhiou.  Accordingly, Diedhiou's allegations are merely conclusory, and his breach of contract claim must be dismissed.  *See Sharbat*, 2022 U.S. Dist. LEXIS 2328, at *12.

### 3. *Diedhiou Sufficiently Pleads Claims Against Goudiaby for Quantum Meruit and Unjust Enrichment*

Goudiaby contends that both the quantum meruit and unjust enrichment claims must be dismissed because Diedhiou did not perform any services that benefited Goudiaby.  Doc. 98 at 19–23.  Diedhiou responds that he and Goudiaby "worked on the [P]roject in tandem," including rendering architectural services, and Goudiaby therefore accepted his services.  Doc. 100 at 12.

"Under New York law, quantum meruit and unjust enrichment claims are analyzed together as a single quasi-contract claim." *Nat'l Util. Serv., Inc. v. Tiffany & Co.*, No 07-cv-3345 (RJS), 2009 WL 755292, at *9 (S.D.N.Y. Mar. 20, 2009) (citing *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005)); *see also Snyder v. Bronfman*, 921 N.E.2d 567, 569 (N.Y. 2009) ("Unjust enrichment and quantum meruit are, in this context, essentially identical claims, and both are claims under a contract implied . . . in law to pay reasonable compensation." (alteration in original) (internal quotation marks omitted)).  To recover in quantum meruit, a plaintiff must establish "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." *Mid-Hudson Catskill.*, 418 F.3d at 175 (citation omitted).  Similarly, to recover under a theory of unjust enrichment, a plaintiff must establish that (1) the defendant was enriched, (2) at the plaintiff's expense, and (3) equity and good conscience militate against permitting the defendant to retain what the plaintiff is seeking to recover.  *Briarpatch Ltd. v. Phx. Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004).  Under either theory, the "essence" of the claim "is that one party has received money or a benefit at the expense of another." *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (citation omitted).

The complaint specifically alleges that Diedhiou performed services for "Senegal and/or Goudiaby," including the location and development of the Property, and he incurred "substantial out-of-pocket expenses on behalf of Senegal and/or Goudiaby." Doc. 95 ¶¶ 2, 34, 40–41.  Moreover, he alleges that Senegal paid Goudiaby over $3 million, and that payment encompasses, at least in part, value derived from services Diedhiou performed, which is why Senegal directed Diedhiou to seek compensation from Goudiaby's share rather than directly from Senegal.  *Id.* ¶¶ 52, 57–58, 63.  Taking all Diedhiou's factual allegations as true, Diedhiou has sufficiently pled that Goudiaby was enriched when Senegal paid him for, essentially, services that (at least in part) *Diedhiou*

performed.  *See Mid-Hudson Catskill*, 418 F.3d at 175; *Briarpatch Ltd.*, 373 F.3d at 306; *Kaye*, 202 F.3d at 616.  Consequently, Goudiaby's motion to dismiss the unjust enrichment and quantum meruit claims is denied.

    *4.  Diedhiou Sufficiently Pleads a Claim for Promissory Estoppel Against Goudiaby*

Under New York law, promissory estoppel requires three elements: (1) "a clear and unambiguous promise"; (2) "a reasonable and foreseeable reliance by the party to whom the promise is made"; (3) and "an injury sustained by the party asserting the estoppel by reason of his reliance."  *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 73 (2d Cir. 1989) (citation omitted).

Goudiaby argues that Diedhiou's claim for promissory estoppel must be dismissed because Diedhiou does not allege that Goudiaby ever promised him anything.  Doc. 98 at 24.  And, even if Goudiaby had made a promise to Diedhiou to pay, there is no indication Diedhiou has been injured by relying upon it.  *Id.* at 25.

But such an argument is belied by the plain text of the complaint.  Diedhiou specifically alleges that "throughout Diedhiou's work on the project, Goudiaby assured him that Senegal would pay Diedhiou for his work, or if they did not, *Goudiaby would pay him*."  *Id.* ¶ 59 (emphasis added).  He further alleges that he "*would not have continued working on the [P]roject* had Goudiaby not provided Diedhiou such assurances."  *Id.* (emphasis added).  Moreover, as noted above, Diedhiou has alleged that Senegal has refused to pay Diedhiou for his services because it paid Goudiaby over $3 million and has directed Diedhiou to seek compensation from Goudiaby instead.  *Id.* ¶¶ 52, 57–58, 63.  Thus, Diedhiou *has* explicitly pled a promise from Goudiaby (to pay him for his services on the Project) and that he detrimentally relied on that promise by continuing to work on the Project but never receiving payment.  Taking Diedhiou's allegations as true, he has therefore stated a claim for promissory estoppel, *see Arcadian Phosphates, Inc.*, 884 F.2d at 73, and Goudiaby's motion to dismiss is denied.

5.  *Teranga is Not an Indispensable Party, But, Even if it Was, that Would Not Require Dismissal of the Action*

Goudiaby argues that Teranga is an indispensable party because its operating agreement required *it*, not Goudiaby, to reimburse Diedhiou for his out-of-pocket expenses, and the entire case must therefore be dismissed under Rule 12(b)(7) for failure to join an indispensable party.  Doc. 98 at 25–27.  In support, he cites case law stating that a party to a contract that is the subject of a litigation is an indispensable party to that litigation.  *Id.* at 26 (citing *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 387 (S.D.N.Y. 2000)).  Diedhiou argues that Goudiaby has failed to satisfy his burden to show indispensability.  Doc. 100 at 14–15.

First, Diedhiou does not allege that *Teranga* was responsible for reimbursing him for out-of-pocket expenses to the exclusion of Senegal and/or Goudiaby; he merely states that its operating agreement "require[d] him to be reimbursed . . . without exception." Doc. 95 ¶ 44.  On a motion to dismiss, the Court must draw all reasonable inferences in Diedhiou's favor.  *Nielsen*, 746 F.3d at 62.  So doing, Diedhiou's complaint may be read to require Senegal (as Teranga's member) or Goudiaby (as Senegal's agent) to have reimbursed Diedhiou for his expenses.  In such situation, Diedhiou's remaining claims may not be premised on any contract with Teranga, particularly given that the Court has already dismissed Diedhiou's breach of contract claim as against Goudiaby.

But, even if Goudiaby is correct that part of Diedhiou's claims arise from breach of Teranga's operating agreement and that the agreement required Teranga, to the exclusion of all others, to pay Diedhiou's expenses, dismissal is not required.  First, Diedhiou also argues that Senegal and Goudiaby—entirely separately from Teranga's operating agreement—orally contracted with Diedhiou to work on the Project and promised to pay him, both for his services and for reimbursement of expenses.  *See, e.g.*, Doc. 95 ¶¶ 20, 24 (alleging that Senegal and Goudiaby first tasked Diedhiou with locating a suitable property *before* Teranga's creation), ¶ 32 (alleging that Goudiaby made

requests of Diedhiou as "steward to the Property," notwithstanding that Goudiaby was not a member of Teranga), ¶ 39 (alleging that Goudiaby and Senegalese officials "repeatedly assured" Diedhiou throughout his years of service that he would be compensated and reimbursed, without mention of Teranga).  At most, therefore, failure to join an indispensable party would require dismissal of Diedhiou's claims only with respect to those predicated solely on the operating agreement.  *Wm. Passalacqua Builders v. Resnick Developers S.*, 933 F.2d 131, 141 (2d Cir. 1991) (affirming district court's dismissal of those claims to which defendant was an indispensable party but not the remaining claims to which it was not indispensable); *see also Universal Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 87 (2d Cir. 2002) (noting that "one of several joint obligors is not typically an indispensable party to an action against the others").

Even more critically, dismissal is the appropriate remedy *only* where joinder of the absent indispensable party is not possible; so long as joinder is possible, it is the appropriate remedy.  *Bank of Am. Corp. v. Braga Lemgruber*, 385 F. Supp. 2d 200, 232 (S.D.N.Y. 2005).  Diedhiou had previously brought claims against Teranga (before dismissing Teranga as a defendant), which evidences that joinder is possible.  *See* Doc. 1.  Therefore joinder, not dismissal, is warranted should Diedhiou seek to proceed with any claims premised on Teranga's breach of its operating agreement.  *See Bank of Am.*, 385 F. Supp. 2d at 232.

### 6.  *The Court Declines to Dismiss Diedhiou's Claims as Time-Barred*

Finally, Goudiaby argues that all claims against him are governed by a three or six-year statute of limitations, and, even under the longer period, "the claims are untimely for the same reasons as set forth in Senegal's motion for summary judgment."  Doc. 98 at 27.  The Court rejects Goudiaby's argument for the same reason as it rejected Senegal's: insofar as Diedhiou alleges he was not due payment until some time after December

2014, did not demand payment until May 2016, and was not denied payment until August 2016, his complaint was within the six-year period and therefore timely.

       *7.  Diedhiou is Granted Leave to Amend*

       The Court will, however, grant Diedhiou leave to amend.  Courts are instructed to "freely give leave [to amend a pleading] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Motions to amend are ultimately within the discretion of the district court judge, *Foman v. Davis*, 371 U.S. 178, 182 (1962), who may deny leave to amend for "good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party," *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (citation omitted); *see also Metcalf v. TransPerfect Translations Int'l, Inc.*, No. 19-cv10104 (ER), 2023 U.S. Dist. LEXIS 54340, at *10 (S.D.N.Y. Mar. 29, 2023) ("The party opposing the motion to amend bears the burden of proving the claim's futility.").  This is a permissive standard since the Federal Rules "accept the principle that the purpose of pleading is to facilitate a proper decision on the merits" of the case.  *Conley v. Gibson*, 355 U.S. 41, 48 (1957).  Moreover, the Second Circuit has counseled strongly against the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims.  *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015)).

       Because this is the Court's first opportunity to highlight the precise defects of Diedhiou's pleading against Goudiaby, and it is not yet apparent that another opportunity to amend would be futile, the Court will permit him to replead the dismissed claims.

III.    **CONCLUSION**

For the foregoing reasons, Senegal's motion for summary judgment is DENIED, and Goudiaby's motion to dismiss is GRANTED in part and DENIED in part.

The parties are directed to appear for a telephonic conference on October 5, 2023 at 4:30 PM.  The parties are directed to call (877) 411-9748 at that time and enter access code 3029857#.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 75 and 96.

It is SO ORDERED.

Dated:    September 6, 2023
          New York, New York

_____
            EDGARDO RAMOS, U.S.D.J.