UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PAPE M. DIEDHIOU,

Plaintiff,

v.

THE REPUBLIC OF SENEGAL et al.,

Defendants.

20 Civ. 5685 (DEH)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

DALE E. HO, United States District Judge:

Following a three-day bench trial, Defendants in this matter jointly moved[1] under Federal Rule 52(c) for a directed verdict on Plaintiff Pape Diedhiou's ("Plaintiff" or "Diedhiou") claims against Defendant Republic of Senegal ("Senegal") for (1) Breach of Contract; (2) Account Stated; (3) Quantum Meruit; (4) Unjust Enrichment; and (5) Promissory Estoppel arising from Senegal's efforts to develop a commercial and governmental building in midtown Manhattan.[2] Diedhiou names both Senegal and Pierre Goudiaby ("Goudiaby") as Defendants in the operative complaint, but has since disclaimed any direct wrongdoing on behalf of Goudiaby.[3] Senegal, however, has asserted crossclaims against Goudiaby that are derivative of Plaintiff's claims.[4] For the following reasons, and after finding facts and weighing credibility as it must under Rule 52(c), the Court concludes that judgment for Defendants Senegal and Goudiaby is warranted as to all claims.

---

[1] Joint Mot. J., ECF No. 224.

[2] Third Am. Compl., ECF No. 119.

[3] Goudiaby Pretrial Statement, ECF No. 211, at 1; Trial Tr. 322:19-23 ("[A]s soon as I fired the lawyer, the first thing I did was to take [Mr. Goudiaby] off the [lawsuit].").

[4] Senegal Answer and Cross-cl.. ECF No. 120. Senegal asserts claims of indemnification and contribution against Goudiaby. *Id.*

## LEGAL STANDARD[5]

In a nonjury trial, Rule 52(c) permits a court to enter judgment against a party on partial findings, so long as the "party has been fully heard on an issue" and "under the controlling law, [the claim or defense raised] can be maintained or defeated only with a favorable finding on that issue." In entering judgment, "the court must find the facts specially and state its conclusions of law separately."[6] "Rule 52(c) authorizes the court to make credibility determinations and resolve disputed issues of fact, applying the same standard of proof and weigh[ing] the evidence as it would at the conclusion of the trial."[7] "Rule 52(c) does not require that the court wait until a party rests its case in chief to enter judgment against that party pursuant to Rule 52(c),"[8] although, here, Defendants made their motion under Rule 52(c) after all parties rested on their evidentiary submissions.[9]

## FINDINGS OF FACT

Based on the trial record, testimony, and exhibits, the Court makes the following factual findings:

---

[5] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

[6] Fed. R. Civ. P. 52(a)(1); *see id*. 52(c).

[7] *Aquino v. Alexander Cap., LP*, No. 21 Civ. 1355, 2023 WL 4364449, at *1 (S.D.N.Y. July 6, 2023), *aff'd*, No. 23-1109 (L), 2024 WL 2952497 (2d Cir. June 12, 2024).

[8] *Id*. at *2.

[9] Trial Tr. 467:9-23.

## I. The Senegal House Development Project

1. In 2007, Senegal conceived of a development project near the United Nations in New York City (the "Senegal House" or the "Project") that would belong to Senegal and would be used to generate revenue to pay for the country's civil servants in the United States.[10]

2. The brainchild behind the concept of Senegal House was Defendant Goudiaby, an architect and engineer with more than fifty years of experience, and who served as a special advisor to Senegal's former president, Abdoulaye Wade.[11]

3. Goudiaby, who is not a registered architect in New York, conducts his international work through his company, Atepa Engineering ("Atepa").[12]

4. Plaintiff Diedhiou is Goudiaby's distant cousin.[13]

5. At the time Senegal House was conceived of, Diedhiou—who is also not a registered architect in the United States—worked for an architecture firm in New York, Urbahn Architects ("Urbahn").[14]

6. To get the Project off the ground, Goudiaby asked Diedhiou to help him secure land near the United Nations and to connect him with a registered New York architecture firm.[15] Diedhiou did both.[16]

---

[10] *Id.* at 355:8-16.

[11] *Id.* 355:18-21; 353:11-14; 354:15-17.

[12] *Id.* 354:1-6; 356:16-17; 357:2-4.

[13] *Id.* 357:21-22.

[14] *Id.* 146:22-23; 147:19-24; 357:5-7.

[15] *Id.* 355:20-23; 356:16-21.

[16] *Id.*; *see also* PX-13 (Durable General Power of Attorney agreement between Paul Badji, Senegal's Ambassador to the United Nations, and Diedhiou with respect to "real estate transactions relating to the acquisition and financing of the property known as 227-235 East 44th Street, New York, New York").

7. Specifically, Diedhiou introduced Goudiaby to Urbahn to co-develop the Project.[17]

8. The Senegalese embassy did not enter into a direct contract with Urbahn, but rather used a special purpose vehicle—Teranga LLC ("Teranga")—for this purpose.[18] Diedhiou was named the manager of Teranga in Teranga's operating agreement.[19]

9. On July 14, 2008, Teranga entered into contract with Urbahn and Atepa to provide architectural services for the Project.[20] Diedhiou signed the contract on behalf of Teranga;[21] Diedhiou also continued to work full-time for Urbahn.[22]

10. After Teranga, Urbahn, and Atepa entered into their agreement, Atepa and Urbahn developed the preliminary studies and worked toward obtaining a building permit.[23] This took several years,[24] and the design phase of the Project was completed in 2012.[25]

11. That same year, 2012, Macky Sall became president of Senegal.[26] President Sall had a different vision for the Project than former-President Wade, and he hired a new architect to complete the work.[27]

---

[17] *Id.* 358:2-7.

[18] *Id.* 357:10-16.

[19] DSX-2 at Diedhiou_000445.

[20] *Id.* 357:2-9; 358:8-11. *See also* DGX-19.

[21] DGX-19 at Diedhiou_000295.

[22] Trial Tr. 359:22-360:1.

[23] *Id.* at 360:4-10.

[24] *Id.* at 360:10-11.

[25] *Id.* at 238:16-17.

[26] *Id.* at 360:18-22.

[27] *Id.* at 361:13-25.

12. Additionally, in 2013, Senegal created Dakar Holdings, Inc. ("Dakar Holdings") and 44 Development LLC ("44 Development")—two new entities to handle the construction phase of the Project.[28]

13. On May 28, 2013, Dakar Holdings entered into a contribution agreement that required Senegal to convey the property to 44 Development.[29] 44 Development then took over the management of the project.[30] Accordingly, the Court finds that Teranga's involvement in the project ceased around 2013.

14. No evidence was presented at trial that showed Diedhiou had any involvement with either Dakar Holdings or 44 Development. Indeed, Diedhiou acknowledged that he did not know these entities existed until he learned about them during discovery.[31]

## II. Work Performed by Plaintiff

15. The Teranga operating agreement does not define the tasks of the Manager aside from noting that Senegal and Diedhiou, as Manager of Teranga, functioned as

> an agent of [Teranga] for the purpose of its business including, without limitation, acquiring, owning, managing, financing, encumbering, refinancing, leasing and selling all or any portion of any real property, and for the purpose of the execution in the name of [Teranga] of any instrument, if applicable, and any other document, certificate, affidavit or the like required or desirable in connection with the business of [Teranga].[32]

---

[28] *Id.* at 449:11-18; *see also* DSX-4.

[29] DSX-5.

[30] Trial Tr. 337:19-21.

[31] *Id.* at 265:24-266:1.

[32] DSX-2 at Diedhiou_000445.

16. Diedhiou testified that as Manager of Teranga, he "had plenty of roles" but that his duties were "not precise" and "a bit vague."[33] He also testified that some of the ill-defined duties included "managing and trying to get the construction going,"[34] "everything that had to do with financings,"[35] "trying to make sure the drawings [were] properly done, trying to make sure the drawings [were] properly filed, anything that had to do with the construction of the building, [and] everything that had to do with financing of the building."[36]

17. Diedhiou also testified as to what was outside the scope of his duties as Manager of Teranga, stating that "Teranga's duty was not to pay recording fee[s], legal fee[s], travel expenses, [or] feasibility studies."[37]

18. Aside from the Teranga operating agreement, no evidence was presented at trial of a written contract governing the services that Diedhiou provided in connection with the Senegal House as Manager of Teranga.

19. In addition to his work as Manager of Teranga, Diedhiou testified that, beginning in 2008, he did interior design work on the Project through a company he owns named Kumpo LLC ("Kumpo").[38]

---

[33] Trial Tr. 200:18-22.

[34] *Id.* at 200:23.

[35] *Id.* at 201:20-21.

[36] *Id.* at 201:21-25.

[37] *Id.* at 200:14-17 ("No, I was not supposed to do that in Teranga, within my role as Teranga manager.").

[38] *Id.* at 180:18-181:11; 269:4-7.

20. At the time Diedhiou was working on the interior design through Kumpo, he was still employed by Urbahn in a full-time position;[39] Diedhiou stated, however, that he never did any work on the Project as an employee of Urbahn.[40]

21. Goudiaby, the architect on the Project,[41] never had a written contract with Kumpo.[42] Atepa also never had a written contract with Kumpo.[43]

22. No evidence was presented at trial of a written contract between Kumpo and Senegal, Kumpo and Urbahn, or Kumpo and Teranga.

23. Kumpo remains an active entity.[44]

24. Diedhiou testified that he remained involved in the Project from 2013 to 2015,[45] however no documentary evidence supports that assertion. In fact, in a 2015 letter admitted as evidence at

---

[39] *Id.*

[40] *Id.* at 269:13-15.

[41] *Id.* at 356:4.

[42] *Id.* at 362:11-13.

[43] *Id.* at 362:14-16.

[44] *See* https://apps.dos.ny.gov/publicInquiry/#search; Trial Tr. 278:4-14.

[45] Trial Tr. at 266:2-14. Specifically, Diedhiou testified that during this period he was "seeking some financing for the project" which included attending business meetings, traveling, sending emails, advising a feasibility study, and preparing paperwork. *Id.* Diedhiou, however, stated that the feasibility study was last updated in March of 2013, *id.* at 33:23-24, and that funding the feasibility study was outside the scope of his duties as Manager of Teranga, *see id.* at 200:14-17. With respect to the trips Diedhiou testified to taking in relation to the project, his testimony was contradictory. *Compare id.* at 102:8-13 ("I remember me coming back to Dakar twice I think it was in 2015 and 2016, and when I landed over there, Mr. Goudiaby was there, I was there, and I remember the CEO of Gaspar was brought in by Goudiaby to see Mr. Macky Sall during those occasions, and we were trying to move the project forward.") *with id.* at 133:4-7 ("I think we flew twice, if I recall, in 2013 and 2014 to Senegal. That's when we met Mr. Goudiaby in Senegal was when he had Gaspar over in Senegal. That's when Mr. Entler met with President Macky Sall . . . ."). The only documentary evidence of these trips include flight itineraries attached to an invoice created by Mr. Diedhiou showing two flights to Senegal in 2009, and a line on said invoice billing for a purported meeting in Dakar in 2012. *See* DSX-8 at Diedhiou_000065, Diedhiou_000585-

trial, Diedhiou represented to a Senegalese official that, "[i]n 2009, [the Project] was finalized with me as the caretaker of the project. . . . *Over the course of 4 years*, I was able to secure a construction permit for the building as well as financing for the project."[46] Additionally, Cheikh Niang, the Foreign Minister of Senegal, testified that he was unaware of any documents showing Diedhiou's continued involvement in the Project after President Sall came into office.[47] Accordingly, the Court finds that Diedhiou did not perform any work for the Project after 2013.[48]

25. Diedhiou testified that he could not distinguish between the work he performed on the Project in his capacity as manager of Teranga, as owner of Kumpo, or in his personal capacity because he "was doing everything at the same time."[49]

## III. Teranga's Operating Agreement

26. The Teranga operating agreement is the entire agreement between Teranga, managed by Diedhiou, and Senegal.[50]

27. Senegal is the sole Member of Teranga.[51]

---

586, and Diedhiou_000622-623. The Court therefore cannot credit Diedhiou's testimony in this regard.

[46] PX-30 (emphasis added).

[47] Trial Tr. 452:1-4.

[48] The Court's conclusion is further supported by the invoice Diedhiou submitted to the Senegalese ambassador to the United Nations, in which he requested payment for "Professional Services" provided as "Manager of Teranga, LLC *$175,000 x 4 years*" and as "Architect Designer/Project Manager *$200,000 x 4 years*." DSX-8 at Diedhiou_000065 (emphasis added). Diedhiou testified that "this was a seven-year bill that he concentrated into four years," but he did not keep any contemporaneous records of the work allegedly performed and provided no credible explanation for such a decision. Trial Tr. at 273:20-24. The Court therefore cannot credit this testimony.

[49] Trial Tr. at 229:7-12 ("I can't . . . answer that question because I was doing everything at the same time."); 230:7-9; 269:1-19.

[50] DSX-2 at Diedhiou_000450.

[51] *Id.* at Diedhiou_000443.

28. Pursuant to Article 5.1 of the operating agreement,

> [A]ll liabilities of [Teranga], whether arising in contract, tort, or otherwise, . . . are solely the liabilities of [Teranga] . . . and will be paid for or satisfied from assets of [Teranga]. No liability of Teranga will be payable in whole or in part by [Senegal] in its capacity as a Member . . . solely by being a Member of [Teranga].[52]

29. The operating agreement made no mention of a salary for Diedhiou as manager of Teranga.[53] The only mention of payment to Diedhiou as manager of Teranga was with respect to reimbursements of his out-of-pocket expenses.[54]

30. Diedhiou read the Teranga operating agreement before he signed it.[55]

31. Teranga remains in existence.[56]

## IV. Compensation

32. On May 1, 2015, Diedhiou submitted an invoice to Fode Seck, the Ambassador of Senegal to the United Nations, in the amount of $2,438,650.[57] The invoice instructed Mr. Seck to "make payment payable to Teranga LLC on behalf of Pape M. Diedhiou."[58]

33. Among other expenses, Diedhiou sought $700,000 for his work as Manager of Teranga ($175,000 x 4 years), and $800,000 as "Architect Designer/Project Manager" ($200,000 x 4 years).[59]

---

[52] *Id.* at Diedhiou_000446.

[53] *See generally id.*; *see also* Trial Tr. 151:8-10 ("Q: This document doesn't mention any compensation to you, correct? A: Obviously, it doesn't mention it.").

[54] DSX-2 at Diedhiou_000448.

[55] Trial Tr. 148:12-15.

[56] *See* https://apps.dos.ny.gov/publicInquiry/#search; Trial Tr. 278:16-22.

[57] DSX-8.

[58] *Id.* at Diedhou_000065.

[59] *Id.*

34. Diedhiou did not keep contemporaneous records of the work he sought payment for in his capacity as Manager of Teranga and in his capacity as Architect Designer/Project Manager.[60]

35. Diedhiou testified that he had conversations with three different Senegalese officials who he claims made verbal promises to pay him.[61]

36. First, Diedhiou said he had a conversation with Mr. Samual Sarr, the former Senegalese Minister of Energy, in 2010[62] in which he purportedly assured Diedhiou that he "would make sure [he got] paid."[63]

37. According to Diedhiou, Mr. Sarr asked him to put together a bill and send it to him, but Mr. Sarr never specified what Diedhiou would be reimbursed for.[64] Indeed, Diedhiou acknowledged that "no numbers were discussed" in the course of this conversation.[65]

38. Next, Diedhiou said that he had a discussion with former Senegalese Foreign Minister Alioune Badara Cisse in September, 2012[66] in which Minister Cisse told Diedhiou to prepare a bill so that he could be paid for his work.[67]

39. Diedhiou acknowledged that Minister Cisse did not make any promises, however, about the rate at which he would be compensated, nor did he make any promises about particular categories of expenses he would be reimbursed for.[68]

---

[60] Trial Tr. at 273:16-19.

[61] *Id.* at 152:14-16; 314:1-16.

[62] *Id.* at 153:25-154:2.

[63] *Id.* at 153:15-24.

[64] *Id.* at 157:1-7.

[65] *Id.*

[66] *Id.* at 314:20-22.

[67] *Id.* at 315:22-25.

[68] *Id.* at 316:1-9.

40. Finally, Diedhiou had a conversation about payment with someone from the Senegalese government named Mr. Mangara in 2013.[69] According to Diedhiou, he met with Mr. Mangara in Dakar to discuss financing of the Project and in the course of that conversation, Diedhiou reminded Mr. Mangara that he had not yet been paid.[70] Mr. Mangara, however, never agreed to compensate Diedhiou at any particular rate, nor did he agree to reimburse Diedhiou for any specific expenses.[71]

41. Diedhiou testified that nobody promised to pay him $175,000 per year as Manager of Teranga, but rather he picked that salary himself "based on industry standard."[72]

42. Diedhiou also admitted that neither Senegal nor Goudiaby ever promised to pay him a specific amount for any services he provided in connection to the Senegal House.[73]

43. In fact, Diedhiou said that "nobody asked me to pay for anything"[74] and that "all of the things that I did, I did on my own without anybody asking me to do anything, period."[75]

44. Ultimately, Diedhiou testified that when he sent the invoice to Mr. Seck, he "was hoping for somebody to respond, and then we [could] go back and forth because it was very difficult . . . to put this together. . . . I figured . . . somebody would just go back and forth, and hopefully somebody would tell me what would work for them and what wouldn't work."[76]

[69] *Id.* at 317:1-4; 318:11-18.

[70] *Id.* at 318:24-319:4.

[71] *Id.* at 319:5-10.

[72] *Id.* at 236:17-20.

[73] *Id.* at 272:8-14.

[74] *Id.* at 62:14.

[75] *Id.* at 62:18-19.

[76] *Id.* at 275:14-22.

## CONCLUSIONS OF LAW

The Court finds for Defendants on Diedhiou's claims of (1) Breach of Contract; (2) Account Stated; (3) Quantum Meruit; (4) Unjust Enrichment; and (5) Promissory Estoppel for three independent reasons. First, Diedhiou has not established standing to raise these claims. Second, even assuming Diedhiou did have standing, the statute of limitations on all five claims expired in 2019, and Diedhiou did not commence this lawsuit until 2020. Third, Diedhiou has failed to establish the elements of his claims for breach of contract, account stated, and promissory estoppel. The Court addresses each of these points in turn.

### I. Standing

"To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm."[77] Diedhiou, who brought this suit *only* in his personal capacity, nevertheless alleges harm for work he performed while wearing three different hats: (1) as Manager of Teranga; (2) as owner of Kumpo; and (3) personally. But any harm is far from concrete, because, according to Diedhiou, he "was doing everything at the same time. I was the manager. I was part Kumpo. I was not like I come in one way and go the other."[78] At trial, he was unable to distinguish between services that he allegedly provided in each role, which renders it impossible to determine liability or any damages allegedly owed to him in his personal capacity—the only capacity in which he brings suit.

Because Diedhiou failed to establish that any alleged injury occurred to himself personally (as opposed to him in his capacity as Manager of Teranga or owner of Kumpo), he has failed to

---

[77] *TransUnion LLC v. Ramirez*, 594 U.S. 413, 417 (2021).

[78] Trial Tr. at 230:7-9.

establish that he suffered any concrete harm and therefore lacks standing.[79] And even if had brought claims on behalf of Kumpo or as Manager of Teranga, any such claims would fail for the same reason—it would be impossible to know what damages he would be owed if he were to prevail on the merits. Moreover, to the extent Kumpo provided services for which it was not compensated, Kumpo, not Diedhiou, sustained the injury, and "[i]t is well-settled that shareholders lack standing to assert individual claims based on injury to the corporation."[80] Furthermore, corporations "must appear through licensed counsel," and Diedhiou proceeds *pro se*.[81] Accordingly, Diedhiou cannot sue in his personal capacity as a *pro se* litigant on behalf of a corporation that has been harmed.[82]

And even if Diedhiou *could* parse out what personal work he was never compensated for, he has no standing to sue *Senegal* (or Goudiaby) for such harm. A well-established element of standing is, of course, causality between the complained of injury and the conduct of the accused.[83] In other words, "the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."[84] Diedhiou has not brought a claim against Teranga, and Teranga's operating agreement places "all liability

---

[79] *Ramirez*, 594 U.S. at 417.

[80] *Baltus-Michaelson v. Credit Suisse First Boston, LLC*, 116 F. App'x 308, 309 (2d Cir. 2004).

[81] *Age Reversal Unity v. N.Y. Univ.*, 2024 WL 3521759, at *2 (S.D.N.Y. July 24, 2024); *see also Lattanzio v. COMTA*, 481 F.3d 137, 139 (2d Cir. 2007) ("[W]e hold that a sole member limited liability company must be represented by counsel to appear in federal court.").

[82] To the extent Plaintiff's theory is that he was never compensated for work he personally performed for Kumpo, Plaintiff still does not have standing to sue *Senegal*. For the same reasons Plaintiff's claims for work performed as manager of Teranga fail, Kumpo—not Senegal—would be the proper entity to seek relief from.

[83] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

[84] *Id.*

arising in contract, tort, or otherwise" squarely on Teranga, not Senegal (or Goudiaby).[85] Diedhiou signed the Teranga operating agreement after reading its terms, and there is no explanation for him to seek payment from another entity—Senegal—rather than the entity he performed services for—Teranga, which continues to exist and has not been dissolved. And Diedhiou has not argued that, nor has he provided any arguments or evidence, to support the notion that Senegal can be sued as any kind of stand-in or alter ego of Teranga.

In sum, Diedhiou failed to establish standing to bring any his claims, warranting judgment against him on that basis alone.

## II. Statute of Limitations

Even if Diedhiou had standing to pursue this matter, the statute of limitations on all claims has run. Breach of contract,[86] account stated,[87] quantum meruit,[88] unjust enrichment,[89] and promissory estoppel[90] are all governed by a six-year statute of limitations. As noted above, the Court has made a factual finding that Diedhiou did not perform any work on the Project after 2013, meaning his claims necessarily accrued prior to December 31, 2013.[91] Accordingly, any lawsuit

---

[85] DSX-2 at Diedhiou_000446.

[86] N.Y. C.P.L.R. 213(2) (McKinney 2022); *Laine v. Empire HealthChoice Assur., Inc.*, 226 N.Y.S.3d 258, 260 (N.Y. App. Div. 2025) ("A cause of action sounding in breach of contract is governed by a six-year statute of limitations").

[87] *Elie Int'l, Inc. v. Macy's W. Inc.*, 965 N.Y.S.2d 52, 53 (N.Y. App. Div. 2013) ("The statute of limitations for a cause of action for an account stated is . . . six years").

[88] *Simon v. FrancInvest, S.A.*, 146 N.Y.S.3d 9, 12 (N.Y. App. Div. 2021) (the statute of limitations for a cause of action for quantum meruit is six years).

[89] *Id.* ("[T]he statute [of limitations] for unjust enrichment is six years.").

[90] *Laine*, 226 N.Y.S.3d at 260 (finding dismissal of promissory estoppel claim proper because it "is . . . governed by a six-year statute of limitations.").

[91] *Minskoff Grant Realty & Mgt. Corp. v. 211 Mgr. Corp.*, 897 N.Y.S.2d 485, 487 (N.Y. App. Div. 2010) (when "the claim is for payment of a sum of money allegedly owed pursuant to a contract, the cause of action accrues when the plaintiff possesses a legal right to demand payment."); *Elie Int'l*, 965 N.Y.S.2d at 53 ("[F]or a cause of action for an account stated . . . it

asserting any of the five causes of action Diedhiou brings must have been filed no later than 2019. But Diedhiou did not commence this lawsuit until 2020.

Diedhiou argues that the statute of limitations on his breach of contract claim should be extended because Senegal had continuing obligations to him pursuant to the contract.[92] Specifically, Diedhiou contends that "continuing contractual obligations create successive breaches, each with its own accrual date" and cites to *Bulova Watch Company v. Celotex Corporation*[93] in support of this assertion.[94] But *Bulova* involved a contract agreement in which the defendant guaranteed it would provide repairs involving their product for a period of 20 years; as a result the Court held "claims arising within six years of the commencement of [the] suit are timely, provided they also arose during the 20-year period to which the guarantee relates."[95] Here, there was no evidence of any contract between Diedhiou and Senegal including any kind of term for which Senegal agreed to provide Diedhiou a payment. The Court therefore finds that there was no continuing obligation between Senegal and Diedhiou.

---

accrues on the date of the last transaction in the account."); *Rauch v. Ciardullo*, 4 N.Y.S.3d 554, 555 (N.Y. App. Div. 2015) ("Inasmuch as the quantum meruit cause of action is subject to a six-year statute of limitations . . . plaintiff's claims are barred to the extent that they allege the performance of services prior to April 25, 2007, which is six years from the commencement of the action."); *U.S. Bank N.A. v. Salem*, 81 N.Y.S.3d 583, 584 (N.Y. App. Div. 2018) ("A cause of action alleging unjust enrichment . . . begins to run upon the occurrence of the alleged wrongful act giving rise to the duty of restitution."); *Seidenfeld v. Zaltz*, 80 N.Y.S.3d 311, 319 (N.Y. App. Div. 2018) (finding a claim for promissory estoppel to accrue six years after the alleged promise was made).

[92] Pl.'s Opp'n Joint Mot. J. at 17, ECF No. 228.

[93] 46 N.Y.2d 606, 611 (1979).

[94] *Id.*

[95] *Bulova*, 46 N.Y.2d at 611. Plaintiff also cites to *Airco Alloys Div. v. Niagara Mohawk Power Corp.*, 76 A.D.2d 68, 80 (N.Y. App. Div. 1980), which states the same holding as *Bulova*, and to *Gaidon v. Guardian Life Ins. Co.*, 96 N.Y.2d 201, 210 (2001), which is not a case involving a breach of contract but rather deceptive business practices.

Diedhiou also argues that the statute of limitations on his claims should be equitably tolled.[96] Equitable estoppel "bar[s] the assertion of the affirmative defense of the Statute of Limitations where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding."[97] Thus, "equitable estoppel will apply where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action" and where the plaintiff "demonstrate[s] reasonable reliance on the defendant's misrepresentations."[98] Diedhiou did not testify to or otherwise identify—and the Court finds no evidence of—any misrepresentations or other deceptive acts that prevented him from asserting his claims within the six year statute of limitations.

Finally, Diedhiou asserts that the statutes of limitations do not apply in this case because of the doctrine of continuous representation.[99] But continuous representation applies only to legal malpractice cases where a plaintiff reasonably relies on a defendant's representations that they are doing the job they were hired to do.[100] Diedhiou's claims do not sound in malpractice, so the continuous representation doctrine is inapposite.

Therefore, Plaintiff's claims are untimely and the Court must find for Defendants.

## III. Failure to State a Claim

Finally, the Court notes that, even if the suit had been timely and Diedhiou had standing to bring his claims, the Court would also find for Defendants on the merits of at least three of

---

[96] Pl.'s Opp'n Joint Mot. J. at 17-18.

[97] *Gen. Stencils v. Chiappa*, 18 N.Y.2d 125, 128 (1966).

[98] *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006).

[99] Pl.'s Opp'n Joint Mot. J. at 18.

[100] *Shumsky v. Eisenstein*, 96 N.Y.2d 164, 167 (2001) ("Application of the continuous representation . . . doctrine is nonetheless generally limited to the course of representation concerning a specific legal matter . . . .").

Diedhiou's claims, as no credible evidence was presented to establish the elements of his breach of contract, account stated, and promissory estoppel claims.[101]

### A. Breach of Contract

A cause of action for breach of contract requires that "(1) a contract exists; (2) plaintiff performed in accordance with the contract; (3) defendant breached its contractual obligations; and (4) defendant's breach resulted in damages."[102] Contracts need not be in writing, however "[w]here the terms of an alleged oral agreement are vague or indefinite, they will not support a cause of action alleging breach of contract."[103]

No evidence of any written contracts between Diedhiou and Senegal or Goudiaby was presented at trial, so the question becomes whether there were any oral agreements that described the terms of Diedhiou's expected performance and Defendants' obligations in return. At trial, Diedhiou described three different conversations he had with various Senegalese officials who told him in one way or another that he "should be paid" or "would be paid" for the work he had already done on behalf of Senegal House. But when pressed on what these Senegalese officials agreed to pay him for, the rate at which he would be paid for his work, or specific categories of expenses that would be reimbursed, Diedhiou said that "nobody asked me to pay for anything," that he did everything "on my own without anybody asking me to do anything" and that "no numbers were discussed." Furthermore, Diedhiou testified that he believed these details would be sorted out after

---

[101] Because it is unnecessary and for purposes of judicial economy, the Court does not also address the merits of Plaintiff's remaining claims. This omission should not be interpreted as an indicator that the Court views those claims any more favorably than the three it addresses. Indeed, as the discussion above likely makes clear, Diedhiou's case at trial was thoroughly lacking, with substantial holes in the evidence.

[102] *34-06 73, LLC v. Seneca Ins. Co.*, 39 N.Y.3d 44, 52 (2022).

[103] *Singh v. T-Mobile*, 222 N.Y.S.3d 545, 550 (N.Y. App. Div. 2024).

he sent the invoice to Senegal for payment and that "somebody would just go back and forth, and hopefully somebody would tell me what would work for them and what wouldn't work."[104]

These vague and indefinite terms—which were discussed *after* Diedhiou allegedly performed the work for which he seeks payment—cannot form the basis of an oral agreement.[105] And, without a contract, there can be no breach.

**B. Account Stated**

"An account stated is an agreement between parties to an account based on prior transactions between them with respect to the correctness of the account items and balance due."[106] "To prevail on a claim for account stated, a plaintiff must establish the following elements: (1) an account was presented; (2) it was accepted as correct; and (3) [the] debtor promised to pay the amount stated."[107] "The second and third requirements . . . may be implied if a party receiving a statement of account keeps it without objecting to it within a reasonable time or if the debtor makes partial payment."[108] That said, it does not always follow that the retention of an account without objection necessarily implies acceptance as correct.[109] "It varies with the circumstances that

---

[104] Trial Tr. 275:14-22.

[105] *Cf. Ingersoll Mill. Mach. Co. v. M/V Bodena*, 619 F. Supp. 493, 503 (S.D.N.Y. 1985) ("A post hoc presentation containing a clause unilaterally purporting to indemnify one of the parties against liability does not operate to modify the original agreement unless the terms are agreed to by the other party and consideration therefor received."). In this case, there was not even an original agreement between Diedhiou and Senegal that was modified by these post hoc conversations, as no oral or written contract was formed prior to the work Diedhiou did that, by his own account, no one asked him to do. Accordingly, the Court finds no evidence of consideration.

[106] *Manhattan Motorcars, Inc. v. Auto. Lamborghini, S.p.A.*, 244 F.R.D. 204, 216 (S.D.N.Y. 2007).

[107] *Yiwu Lizhisha Accessories Co., Ltd. v. Jjamz*, 336 F. Supp. 3d 179, 183 (S.D.N.Y. 2018).

[108] *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 679 F. Supp. 2d 395, 411 (S.D.N.Y. 2009).

[109] *Manhattan Motorcars*, 244 F.R.D. at 216.

surround the submission of the statements and those circumstances include, of course, the relation between the parties."[110] In sum, "[r]ecovery on a claim for account stated is permitted on the theory that the parties have, by their conduct, evidenced an agreement upon the balance of an indebtedness."[111]

At trial, no evidence was presented that Senegal expressly objected to the invoice presented by Diedhiou. But the Court cannot conclude that this silence amounts to an implied acceptance of the account. In considering the relationship between Senegal and Diedhiou, evidence presented at trial indicates that Senegal had no ongoing, independent connection to Diedhiou that would have prompted acknowledgment, negotiation, or payment of the invoice presented by him. Senegalese Foreign Minister Niang testified that Senegal "did not appoint [Mr. Diedhiou]" and that for Senegal, Diedhiou "was just working as a kind of clerk or as a kind of aide to the person the Senegal government was working with, which was [Mr. Goudiaby]."[112] Indeed, Minister Niang testified that upon receipt of some correspondences from Diedhiou, Minister Niang "always said no . . . because this is private. This is between [Mr. Diedhiou] and [Mr. Goudiaby] so I'm not going to get in between or to be involved."[113] The absence of a contract, written or verbal, supports the conclusion that Senegal had no independent relationship with Diedhiou. Indeed, because, as some courts have held, "[a]n account stated must be in reference to an *underlying contract*,"[114] the absence of a contract presents another reason that Diedhiou's claim for account stated fails.

[110] *Id.*

[111] *Id.*

[112] Trial Tr. at 450:11-14.

[113] *Id.* at 451:22-24.

[114] *Assembly Point Aviation, Inc. v. Richmor Aviation, Inc.*, No. 13 Civ. 298, 2017 WL 2223919, at *3 (N.D.N.Y. May 19, 2017) (emphasis in original).

Without acceptance of the account or an underlying contract, Plaintiff cannot recover on the theory of account stated.

### C. Promissory Estoppel

"A cause of action for promissory estoppel under New York law requires the plaintiff to prove three elements: 1) a clear and unambiguous promise; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the relying party as a result of the reliance."[115] "A promise that is too vague or too indefinite is not actionable under a theory of promissory estoppel."[116] For the same reasons the Court concludes that no verbal contract was ever formed based on the vague and indefinite conversations Diedhiou had with various Senegalese officials, his claim for promissory estoppel also fails. Any promises made to him lacked the requisite specificity to be clear and unambiguous.

## CONCLUSION

For the reasons stated herein, the Court finds in Defendants' favor on all claims. The Clerk of Court is hereby directed to enter final judgment in favor of Defendants and to dismiss the case with prejudice.

SO ORDERED.

Dated: September 22, 2026

New York, New York

DALE E. HO
United States District Judge

[115] *Kaye v. Grossman*, 202 F.3d 611, 615 (2d Cir. 2000).

[116] *Bd. of Trs. ex rel. Gen. Ret. Sys. of Detroit v. BNY Mellon, N.A.*, No. 11 Civ. 6345, 2011 WL 3930112, at *6 (S.D.N.Y. Sept. 10, 2012).